IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FEDERAL DEPOSIT INSURANCE CORPORATION,

        Plaintiff,

   v.

JUDITH WARREN, et al.,

        Defendants.
_____/

No. C 11-3260 CW

ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 47 & 55)

    Plaintiff Federal Deposit Insurance Corporation (FDIC) brings this action as receiver for IndyMac Bank, F.S.B., against Defendant Judith Warren for breach of contract and negligent misrepresentation.[1]  The parties filed cross-motions for summary judgment.  After considering all of the parties' submissions and oral argument, the Court denies both motions.

BACKGROUND

    Defendant Warren is a professional real estate appraiser based in Sonoma County, California.  Declaration of Nathaniel Lucey, Ex. B, at 1-9.  In April 2006, she was commissioned to appraise a six-bedroom Victorian house in Healdsburg by a local mortgage broker, Priority Lending.  Id.  She visited the property on May 2, 2006 and submitted an appraisal report the following week.  Id. at 8; Compl. ¶ 10.  Her report classified the property as a single-family residence with an estimated value of $2.4 million.  Lucey Decl., Ex. B, at 1-1 to 1-2.

---

[1] FDIC also initially filed suit against a second defendant, Patricia Dennis but has voluntarily dismissed the claims against her.  Docket No. 84.

Priority Lending used Warren's appraisal report to broker a loan for the property's owner, Susan Moreno, who was seeking to refinance at the time.  Lucey Decl., Ex. A, at 32:16-33:9.  A local mortgage lender, Paul Financial, LLC, underwrote and funded a $1.4 million loan to Moreno in late May 2006.  Declaration of Ignacio Gomez, Exs. B-G.  Three months later, in August 2006, Paul Financial sold the loan to IndyMac, a Los Angeles-based savings and loan association, as part of a "secondary market bulk transaction."  Id. at 36:2-:11; Gomez Decl. ¶ 19, Ex. H.  Although the loan was packaged with other mortgages in the sale to IndyMac, none of the parties knows the exact number of loans that IndyMac acquired in the transaction.  See Lucey Decl., Ex. A, at 36:12-:21.

IndyMac followed a specific protocol at that time for deciding whether to bid on bulk loan packages in the secondary mortgage market.  This protocol relied principally on a series of spreadsheets, called "datatapes," which were created by loan originators to summarize the basic characteristics of a loan package for potential bidders.  Lucey Decl., Ex. A, at 39:17-40:3; Gomez Decl. ¶ 11.  The datatapes contained information about every loan in the package, including the loan amount, loan type, interest rate, and appraised value of the encumbered property.  Lucey Decl., Ex. A, at 39:17-40:3, 45:4-:12.  Like other banks, IndyMac used this information to calculate the loan-to-value ratio of every loan within a given package; if the loan-to-value ratio for each loan fell within certain parameters, IndyMac would bid on the package.  Id. 42:12-:19, 70:5-:9; Gomez Decl. ¶¶ 16-18, 22-24.  Because the datatapes stored all of the relevant information

2

electronically, IndyMac's entire process for purchasing mortgages on the secondary market was automated. Id. ¶¶ 16-18, 22-24.

In 2006, when IndyMac purchased the Moreno loan, the bank's policy was to purchase only residential mortgages with a loan-to-value ratio of less than sixty-five percent.[2] Gomez Decl. ¶ 22. This upper limit was intended to provide an "equity cushion," protecting the bank against losses if a borrower defaulted and the bank was forced to foreclose on the property. Id. ¶ 33. The Moreno loan, which had a loan-to-value ratio of fifty-eight percent, easily fell within IndyMac's parameters, based on the figures in Warren's appraisal report.[3]

Sometime in 2009, Moreno defaulted on her loan. Lucey Decl., Ex. A, at 51:1-:6; Gomez Decl. ¶ 32. IndyMac commenced foreclosure proceedings against her but was ultimately unable to recoup all of its losses from sale of her property. Lucey Decl., Ex. A, at 52:12-:16; Gomez Decl. ¶ 33.

On July 1, 2011, FDIC filed this suit as receiver for IndyMac, alleging that Warren breached her appraisal contract. Compl. ¶¶ 30-46. In particular, FDIC contends that Warren overstated the value of Moreno's property and incorrectly classified it as a single-family residence despite evidence that Moreno was using the property as a bed-and-breakfast at the time. Id. ¶¶ 9-15. According to FDIC, Warren's misrepresentations

---

[2] The loan-to-value ratio is calculated by dividing the amount of the loan by the appraised value of the encumbered property.

[3] In Moreno's case, the loan-to-value figure would have been $1.4 million (her loan amount) divided by $2.4 million (the appraised value of her home), which equals roughly fifty-eight percent.

3

induced IndyMac to purchase the Moreno mortgage, which, ultimately, caused it to suffer damages. Id. ¶ 46.

On October 9, 2012, Warren moved for summary judgment. FDIC cross-moved for summary judgment one week later.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

4

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.

5

1  Id.  This is true even though the non-moving party bears the
2  ultimate burden of persuasion at trial.  Id. at 1107.

DISCUSSION

I.  Breach of Contract (First Cause of Action)

    A.  Warren's Motion for Summary Judgment

6  To establish liability for breach of contract, a plaintiff
7  must demonstrate that the defendant entered into a contract,
8  breached the contract, and caused the plaintiff to suffer damages
9  as a result.  FDIC v. Levitt, 2011 WL 4591933, at *2 (S.D. Cal.);
10 Roth v. Malson, 67 Cal. App. 4th 552, 557 (1998).  When the
11 plaintiff asserts the claim as a third-party beneficiary, then it
12 must also show that the contract was made expressly for its
13 benefit.  Cal. Civ. Code. § 1559; San Diego Hous. Comm'n v. Indus.
14 Indem. Co., 95 Cal. App. 4th 669, 685 (2002).

15 Here, FDIC has offered sufficient evidence to support an
16 inference that Warren is liable for breach of contract.  It points
17 specifically to the "Appraiser's Certification" that Warren signed
18 as part of her appraisal report, which acknowledges that any
19 "intentional or negligent misrepresentation(s) contained in this
20 appraisal report may result in civil liability."  Lucey Decl., Ex.
21 B, at 1-9.  The certification also provides that "mortgage
22 insurers, government sponsored enterprises, and other secondary
23 market participants may rely on this appraisal report as part of
24 any mortgage finance transaction that involves any one or more of
25 these parties."  Id. (emphasis added).  This language is
26 sufficient to support an inference that Warren signed a contract
27 intended to benefit potential secondary market bidders like
28 IndyMac.

6

In addition to the certification, FDIC has offered evidence that Warren misrepresented both the value and commercial nature of the Healdsburg property. It provides a sworn declaration from another licensed real estate appraiser who asserts that Warren's report overvalued Moreno's property by more than half a million dollars. Declaration of Howard Levy ¶ 15. FDIC also submits a declaration from Moreno herself stating that she was openly operating a bed-and-breakfast on the property when Warren conducted her appraisal. See Moreno Decl. ¶¶ 2, 5-10. Specifically, Moreno claims that the house was in a "guest-ready" state when Warren visited in May 2006, with a rack of "brochures for local attractions" and a "guest book" displayed on the main floor. Id. ¶¶ 5, 10-11. Because this information was omitted from Warren's appraisal report -- which classified the property simply as a single-family residence -- FDIC argues that Warren knowingly misidentified the property as residential.

Finally, FDIC presents evidence that IndyMac was harmed by the alleged misrepresentations in Warren's report. It provides a declaration from IndyMac's former vice-president stating that Warren's inflated appraisal value distorted the true loan-to-value ratio of Moreno's mortgage and, ultimately, led IndyMac to assume unknown risks when it purchased the mortgage on the secondary market. Gomez Decl. ¶¶ 31-33. As a result, when Moreno defaulted on the loan in 2009, IndyMac was unable to sell the Healdsburg property at its expected price and was forced instead to sell the property at a significant loss. Id. FDIC contends that IndyMac

7

would never have purchased the loan had it been properly classified as a commercial property with a lower estimated value.[4]

Taken together, FDIC's evidence is sufficient to support an inference that Warren is liable to IndyMac for breach of contract. Accordingly, Warren's motion for summary judgment is denied with respect to FDIC's contract claim.

B.  FDIC's Cross-Motion for Summary Judgment

Although FDIC has produced sufficient evidence to survive Warren's summary judgment motion, it has not established that it is itself entitled to summary judgment. Warren identifies several disputes of material fact that preclude summary judgment here. Most of these deal with whether and to what extent she actually breached the appraisal contract.

For example, Warren denies that she overstated the value of Moreno's property. She submits a declaration from a licensed real estate appraiser who states that, if anything, Warren's 2006 appraisal report understated the value of the property by about thirty-thousand dollars. Declaration of Ted Faravelli ¶ 12, Ex. E. This stands in stark contrast to the declaration submitted by FDIC's real estate appraiser, who estimated that Warren overvalued the property by half a million dollars. Levy Decl. ¶ 15, Ex. D. The two appraisers also dispute whether Warren properly classified the property as residential and, relatedly, whether she was qualified to appraise the property in the first place. Id. ¶¶ 8-10; Faravelli ¶¶ 8, 10-11; see also Moreno Decl.

---

[4] Any property value below $2.2 million would have pushed the Moreno mortgage's loan-to-value ratio above IndyMac's sixty-five percent ceiling and, thus, dissuaded the bank from bidding on the loan package. Gomez Decl. ¶ 23.

8

¶¶ 2, 5-10 (stating that the property was used for commercial purposes). These factual disputes -- which are central to the question of whether Warren breached the appraisal contract -- cannot be resolved on summary judgment. As such, FDIC's cross-motion must be denied.[5]

II. Negligent Misrepresentation (Second Cause of Action)

    A. Warren's Motion for Summary Judgment

To prevail on a negligent misrepresentation claim, a plaintiff must show that (1) the defendant knowingly misrepresented a material fact; (2) the defendant intended to induce the plaintiff to rely on its misrepresentation; and (3) the plaintiff did, in fact, reasonably rely on the misrepresentation and suffer damages as a result. Levitt, 2011 WL 4591933, at *3; Cont'l Airlines, Inc. v. McDonnell Douglas Corp., 216 Cal. App. 3d 388, 402 (1989).

FDIC has produced sufficient evidence here to support an inference that Warren is liable for negligent misrepresentation. As noted above, FDIC has offered evidence that Warren knowingly overstated the value of the Healdsburg property and incorrectly classified it as a single-family residence. See Levy Decl. ¶ 15; Moreno Decl. ¶¶ 5, 10-11. In addition, it has presented evidence that Warren made these misrepresentations knowing that "secondary market participants may rely on [her] appraisal report" in future "mortgage finance transactions." See Lucey Decl., Ex. B, at 1-9. Finally, FDIC has presented evidence that, if not for Warren's

---

[5] FDIC's attempt to discredit Warren's expert does not alter this outcome. See Bator v. State of Hawai'i, 39 F.3d 1021, 1026 (9th Cir. 1994) ("At the summary judgment stage, . . . the district court may not make credibility determinations or weigh conflicting evidence.").

9

1 alleged misrepresentations, IndyMac would have never purchased the
2 Moreno mortgage nor suffered any economic harm as a result.  See
3 Gomez Decl. ¶¶ 27-28, 31.

4 Nevertheless, Warren contends that FDIC has not -- and
5 cannot -- produce evidence that IndyMac actually relied on her
6 alleged misrepresentations when it decided to purchase the Moreno
7 loan.  She notes that California courts have recognized that, to
8 establish liability for negligent misrepresentation, the plaintiff
9 must make a showing of "actual reliance" on the defendant's
10 misrepresentation.  See Mirkin v. Wasserman, 5 Cal. 4th 1082, 1088
11 (1993) (citing Garcia v. Superior Court, 50 Cal. 3d 728, 737
12 (1990)).  This requirement cannot be satisfied merely by alleging
13 that the defendant's misrepresentation was communicated to the
14 plaintiff indirectly, such as through an intermediary.  Mirkin, 5
15 Cal. 4th at 1095-1100.  Rather, the plaintiff "who hears an
16 alleged misrepresentation indirectly must still show 'justifiable
17 reliance upon it'" to prevail on its negligent misrepresentation
18 claim.  Id. at 1096 (citing Restatement (Second) of Torts § 533).

19 Here, FDIC acknowledges that it has no evidence that any
20 IndyMac employee actually looked at Warren's appraisal report or
21 even at a datatape summarizing her report.  Still, FDIC asserts
22 that IndyMac's reliance on the report may be inferred from the
23 bank's automated system for purchasing only residential mortgages
24 with a specific loan-to-value ratio.  In other words, FDIC argues
25 that, without Warren's appraisal report -- which allegedly
26 overvalued the Healdsburg property and misidentified it as
27 residential -- the Moreno mortgage would never have been included
28 in a purchase that met IndyMac's purchasing criteria.  Thus, it

10

1 asserts, "the fact that IndyMac purchased the loan at all
2 establishes that it relied on Defendant's Appraisal."  Pl.'s
3 Cross-Mot. & Opp. 18.

4     FDIC has provided evidence that IndyMac's entire system for
5 purchasing loans on the secondary mortgage market was automated.
6 Gomez Decl. ¶¶ 15-17.  It acknowledges that, using this system,
7 IndyMac's employees exercised minimal control and enjoyed limited
8 discretion.  In fact, according to FDIC's own evidence, when
9 IndyMac purchased loans on the secondary market, any "information
10 which was transferred from the datatape [onto IndyMac's computers]
11 could not be manually altered by IndyMac's employees."  Id. ¶ 16.
12 The automated nature of this process obviates the need for FDIC to
13 show that individual IndyMac employees actually read Warren's
14 appraisal report.  IndyMac's purchasing formula -- which utilized
15 electronic information about loan type and property value stored
16 on the datatapes -- sufficiently demonstrates that it relied on
17 the information in her report.  Thus, under these circumstances,
18 actual reliance may be inferred despite the lack of direct
19 evidence that a particular individual examined the datatape and
20 relied on it.

21     Warren contends that the California Supreme Court's decision
22 in Mirkin, 5 Cal. 4th at 1108, precludes such an inference.  In
23 Mirkin, two stockholders brought a negligent misrepresentation
24 claim against a corporation, its directors, and its accounting
25 firm for allegedly inflating the corporation's stock prices and
26 misrepresenting its financial prospects.  Id. at 1087-88.  The
27 court held that the plaintiffs, who had purchased their stock in
28 the corporation at the inflated prices, could not state a claim

11

because they "conceded that they could not plead that they had actually read or heard the alleged misrepresentations." Id. at 1088, 1089 n.2, 1108. In reaching this conclusion, the court specifically rejected the plaintiffs' argument that they were entitled to a presumption of reliance because they "'reli[ed] on the integrity of the securities market and the securities offering process.'" Id. at 1089 (quoting plaintiffs) (alteration in original). It held that this broad reliance on market integrity was insufficient to establish the "actual reliance" element of negligent misrepresentation. Id. at 1095-1101.

Although IndyMac purchased the Moreno loan on an open market, its reliance claim is not based on the integrity of that market. Rather, FDIC has offered a detailed explanation of how IndyMac relied on specific elements of Warren's appraisal report -- namely, its alleged misrepresentations about the Healdsburg property -- in purchasing the loan. Moreover, as outlined above, it has presented evidence to support that explanation. Thus, FDIC's theory of reliance is much more concrete than the plaintiffs' theory in Mirkin. Warren's motion for summary judgment must therefore be denied.

B.   FDIC's Cross-Motion for Summary Judgment

As discussed above, the parties dispute whether Warren actually misrepresented the value of the Healdsburg property and whether she properly classified it as residential. Accordingly, the same evidentiary conflicts that preclude the Court from granting summary judgment on FDIC's breach of contract claim also preclude it from granting summary judgment on FDIC's negligent misrepresentation claim.

12

CONCLUSION

For the reasons set forth above, the Court DENIES Warren's motion for summary judgment (Docket No. 47) and DENIES FDIC's cross-motion for summary judgment (Docket No. 55).

Warren's late-filed motion to file documents under seal (Docket No. 81) is GRANTED. Warren has presented compelling reasons to redact certain third-party financial information in her supporting declarations.

The parties are referred to Magistrate Judge Vadas for a settlement conference. A final pretrial conference is scheduled for 2:00 p.m. on June 26, 2013. A seven-day jury trial is set to begin at 8:30 a.m. on July 18, 2013.

IT IS SO ORDERED.

Dated: 3/7/2013

CLAUDIA WILKEN
United States District Judge